1 | **JENNIFER L. COON**
California State Bar No. 203913
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4 | E-Mail: jennifer_coon@fd.org

5 | Attorneys for Mr. Garcia

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE M. JAMES LORENZ)**

11 | UNITED STATES OF AMERICA,              )      CASE NO. 08cr1448-L
                                          )
12 |              Plaintiff,                )      DATE:        September 2, 2008
                                          )      TIME:        2:00 p.m.
13 | v.                                     )
                                          )      STATEMENT OF FACTS AND
14 | JOSE MANUEL GARCIA,                     )      MEMORANDUM OF POINTS AND
                                          )      AUTHORITIES IN SUPPORT OF MOTIONS
15 |              Defendant.                )

16

17 | I.

18 | **STATEMENT OF FACTS**[1]

19 | **A.    Arrest**

20 |        Mr. Garcia was arrested on February 17, 2008.  The government alleges that, on that date, Border

21 | Patrol Agent R. Butler was driving east on Highway 94 in the Campo area, 10 miles east of the Tecate,

22 | California port of entry and a half mile north of the border, at approximately 6:30 a.m.  At that time, Agent

23 | Butler saw a group of five people standing on the corner of Highway 94 and Buckman Springs Road.  All five

24 | people in the group, including Mr. Garcia, were waving at Agent Butler to get his attention and flag his car

25 | down.  They were cold, hungry, tired, and in distress.  The government further alleges that, after questioning

26 | Mr. Garcia regarding his citizenship and permission to legally enter the United States, the border patrol agent

27 | arrested Mr. Garcia and transported him to the Campo Border Patrol Station.  At the station, more than six

28

---

[1] The following statement of facts and exhibits is based primarily on information and evidence provided by the government in discovery.  Mr. Garcia does not admit the accuracy of all such information and evidence and reserves the right to challenge its accuracy.

1   hours later, Mr. Garcia was subjected to further questioning.  He was subsequently charged with one count

2   of violating 8 U.S.C. §§ 1326(a) and (b) (illegal alien found in the United States after deportation).

3   **B.    Underlying Deportations**

4           Mr. Garcia is a long-time resident of the United States and a dedicated father.  Mr. Garcia's birth father

5   died when Mr. Garcia was just two years old.  He came to the United States in 1979, when he was about nine

6   years old.  *See* Exhibit A (Application for Temporary Residence Status).[2]  At that time, his mother remarried

7   a U.S. citizen.  *See* Exhibit B (Declaration of Robert Soliz Arroyo).  Mr. Garcia lived as a family with his

8   mother, U.S. citizen stepfather, and two sisters.  *See id.*  He attended elementary school, junior high, and high

9   school in the greater Los Angeles area.  *See* Exhibit C (School Records).  Mr. Garcia applied for Temporary

10  Residence in October 1987, as part of the amnesty program, and was granted temporary residence status in

11  December 1987.  *See* Exh. A.  He subsequently became a lawful permanent resident of the United States on

12  June 12, 1990.  *See* Exhibit E (1995 Order to Show Cause).  Since leaving high school in the 10th grade, Mr.

13  Garcia has had a steady history of employment in the United States, primarily in construction and landscaping.

14  He had a long-term relationship with his former common-law wife, Eileen Soto, a U.S. citizen, with whom

15  he shares an eight-year-old son, Erick, also a U.S. citizen.  He currently shares custody of Erick with his in-

16  laws, who consider him to be a wonderful and dedicated father.  *See* Exhibit K (Letter from Jose Perez &

17  Maria Elena Perez).

18          1.    1995 Deportation

19          Documents provided in discovery indicate two alleged deportations in this case.  The first alleged

20  deportation occurred pursuant to an immigration judge order dated October 23, 1995.  *See* Exhibit D (1995

21  Order of the Immigration Judge).  The proceedings were initiated by an Order to Show Cause dated February

22  9, 1995.  *See* Exhibit E (1995 Order to Show Cause).  In the OSC, the immigration service alleged that Mr.

23  Garcia had suffered a prior conviction on December 22, 1994, for simple possession of cocaine in violation

24  of Cal. Health & Safety Code § 11350(a), and that he was deportable due to conviction of an offense relating

25  to a controlled substance.  *See id.*

26

27

28          [2] Exhibits A through J are true and correct copies of documents produced by the government
        in discovery from Mr. Garcia's A-file.  Exhibit K is a true and correct copy of a letter received by
        defense counsel from Mr. and Mrs. Perez.

1      A full month prior to the deportation hearing, and while they were holding Mr. Garcia on an

2  immigration detainer, the immigration authorities asked Mr. Garcia to sign forms admitting all allegations in

3  the OSC, requesting prompt deportation, and waiving all rights to apply for relief. *See* Exhibit F (Request for

4  Prompt Deportation) and Exhibit G (Request for Disposition).  Despite a subsequent handwritten notation on

5  one of the forms that Mr. Garcia "qualifies for 212(c)" (Exh. F) – indicating the immigration authorities'

6  understanding that Mr. Garcia in fact had realistic prospects for relief – no one explained to Mr. Garcia the

7  available forms of relief or the import of such a waiver.  Without benefit of counsel or an understanding of

8  what relief was available to him, Mr. Garcia signed the forms.  *See id.*

9      At the deportation hearing, the immigration judge gave a group advisal as to the right to counsel.[3]  He

10  then perfunctorily solicited Mr. Garcia's waiver of that right:

11      Q:    Jose Manuel Garcia, do you wish to have your hearing today?

12      A:    Yes, sir.

13      Q:    Do you wish to represent yourself?

14      A:    Yes, sir.

15  The IJ never followed up this exchange with any questions to determine whether Mr. Garcia understood his

16  right to counsel, whether he understood the implications of waiving such a right, or whether his waiver was

17  knowing and voluntary.

18      Later in the hearing, the IJ informed Mr. Garcia that he appeared "eligible to apply for a waiver of

19  deportability," which he later stated was under "212(c)."  He further stated that, once deported, Mr. Garcia

20  would lose his resident status, "and there won't be any way of getting it back, because this crime is for cocaine,

21  and there's no waiver for cocaine no matter how small the amount."  The IJ never explained to Mr. Garcia,

22  however, what Section 212(c) relief was, the basis for that relief, Mr. Garcia's prospects for receiving that

23  relief, how it was that Mr. Garcia might be able to apply for that relief despite his prior execution of multiple

24  waiver forms, or how it was that he could receive such relief if there was "no waiver" for cocaine.  Mr. Garcia,

25  having already signed multiple documents purporting to waive his right to apply for any relief, and without

26

27  _____

28      [3] A transcript of relevant portions of the deportation tape will be submitted under separate
cover.

1  either the benefit of counsel or an understanding as to what that relief was or how counsel might assist him

2  to obtain it, did not apply for a Section 212(c) waiver.  As a result, the IJ erroneously ordered his deportation.

3      At the conclusion of the hearing, the IJ elicited the government's waiver of its right to appeal.

4  Although the IJ had given a group advisal as to the right to appeal at the outset of the hearing, he never asked

5  Mr. Garcia whether he wanted to waive that right.

6      2.   <u>1997 Deportation</u>

7      The second alleged deportation at issue in this case occurred pursuant to an immigration judge order

8  dated February 25, 1997.  *See* Exhibit H.  That proceeding was initiated by an Order to Show Cause dated

9  February 18, 1997.  *See* Exhibit I (1997 Order to Show Cause).  In the OSC, the government erroneously

10  alleged that Mr. Garcia had suffered a conviction on April 15, 1996, for manufacture and importation of

11  firearms in violation of Cal. Penal Code § 12020(a).  *See id.*  The OSC further alleged that Mr. Garcia was

12  removable due to his purported conviction for a firearms offense and his entry without inspection.  *See id.*

13      In fact, however, the conviction documents in the A-file clearly show that Mr. Garcia's alleged

14  § 12020(a) conviction related to possession of a "billy," i.e., a nightstick, and not a firearm.  *See* Exhibit J

15  (Complaint and Judgment for Cal. Penal Code § 12020(a) Offense).  He has never been convicted of a

16  firearms offense or any other violent crime.  Moreover, because his prior deportation and resulting loss of his

17  lawful resident status was defective, Mr. Garcia could not have entered without inspection.  As a result, the

18  IJ clearly erred in finding Mr. Garcia deportable on the grounds alleged in the OSC.

19  **II.**

20  **<u>MOTION TO DISMISS THE INDICTMENT DUE TO INVALID DEPORTATION</u>**

21      The indictment against Mr. Garcia must be dismissed because both of the alleged underlying

22  deportation orders violated due process.  First, the 1995 deportation order violated Mr. Garcia's due

23  process rights, including his right to counsel, his right to appeal, and his right to be informed adequately of

24  his eligibility for relief.  Mr. Garcia did not knowingly and intelligently waive his right to counsel, nor was

25  he adequately advised regarding his right to appeal.  These egregious errors were compounded by the IJ's

26  failure to explain adequately Mr. Garcia's eligibility for a waiver of deportation under former Immigration

27  and Nationality Act § 212(c).  As a longtime lawful permanent resident, with substantial family ties to the

28  United States and other equities, Mr. Garcia had plausible grounds for that relief.  However, the IJ never

1  explained to Mr. Garcia – an alien with no legal education and experience, appearing without the benefit

2  of counsel – what Section 212(c) relief was, the requirements for obtaining such relief, or his prospects for

3  receiving such relief.  As a result, Mr. Garcia's 1995 deportation was prejudicial and fundamentally unfair.

4  Second, the 1997 deportation order was also invalid.  The IJ erroneously found that Mr. Garcia's alleged

5  conviction for possession of a "billy" under California Penal Code § 12020(a) was a firearms offense

6  rendering him removable.  To the contrary, Mr. Garcia's alleged § 12020(a) conviction did not concern a

7  firearm, nor has he ever been convicted of any other firearms offense.  Moreover, the IJ's conclusion that

8  Mr. Garcia was deportable for entry without inspection was invalid, because his prior deportation and

9  resulting loss of status was invalid.  Because Mr. Garcia's pending charge is based on removals that were

10  fundamentally unfair, this Court must dismiss the indictment against him.

11  **A.**    **Requirements for Collateral Attack of a Removal Order**

12  "In a criminal prosecution under § 1326, the Due Process Clause of the Fifth Amendment requires

13  a meaningful opportunity for judicial review of the underlying deportation."  *United States v. Zarate-*

14  *Martinez*, 133 F.3d 1194, 1197 (9th Cir. 1998).  A defendant such as Mr. Garcia, who is charged with

15  illegal reentry under § 1326, has a Fifth Amendment right to attack his removal order collaterally because

16  the removal order serves as a predicate element of his conviction.  *United States v. Mendoza-Lopez*, 481

17  U.S. 828, 837-38 (1987) ("Our cases establish that where a determination made in an administrative

18  proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be

19  some meaningful review of the administrative proceeding.").  *See also United States v. Ubaldo-Figueroa*,

20  364 F.3d 1042, 1047-48 (9th Cir. 2004) (citing *Zarate-Martinez* and *Mendoza-Lopez* for these principles).

21  To successfully collaterally attack his deportation, Mr. Garcia must demonstrate that: 1) he

22  exhausted all administrative remedies available to him to appeal his removal order; 2) the underlying

23  removal proceedings at which the order was issued improperly deprived him of the opportunity for

24  judicial review; and, 3) the entry of the order was fundamentally unfair.  8 U.S.C. § 1326(d); *Ubaldo-*

25  *Figueroa*, 364 F.3d at 1048.  "An underlying removal order is 'fundamentally unfair' if:  '1) a defendant's

26  due process rights were violated by defects in his underlying deportation proceeding, and 2) he suffered

27  prejudice as a result of the defects.'"  *Id.* at 1048 (citing *Zarate-Martinez*, 113 F.3d at 1197) (brackets

28  omitted).

1    In determining whether a defendant has been prejudiced by the defective deportation proceedings,

2  a defendant need not show that he actually would have received relief.  *See United States v. Arrieta*, 224

3  F.3d 1076, 1079 (9th Cir. 2000).  Rather, he only has to show that he had "plausible grounds" for such

4  relief.  If such relief was "plausible," then the deportation or removal cannot be used as a basis for a

5  § 1326 indictment, which must be dismissed.  Moreover, once Mr. Garcia makes a prima facie showing of

6  prejudice, ***"the burden shifts to the government to demonstrate that the procedural violation would not***

7  ***have changed the proceedings' outcome."***  *United States v. Gonzalez-Valerio*, 342 F.3d 1051, 1054 (9th

8  Cir. 2003) (emphasis added).  As explained below, Mr. Garcia can demonstrate each of the elements

9  necessary for this Court to sustain his collateral attack

10  **B.**    **The 1995 Deportation Was Invalid and Fundamentally Unfair**

11    1.    The Deportation Hearing Violated Mr. Garcia's Due Process Rights

12        a.    Mr. Garcia Did Not Knowingly and Intelligently Waive His Right to Counsel

13    A respondent in immigration proceedings has an absolute right to counsel at no cost to the

14  government.  *See Ram v. Mukasey*, 529 F.3d 1238, 1241 (9th Cir. 2008) ("Although there is no Sixth

15  Amendment right to counsel in an immigration hearing, Congress has recognized it among the rights

16  stemming from the Fifth Amendment guarantee of due process that adhere to individuals that are the

17  subject of removal proceedings") (citing *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir.2004)).

18  Accordingly, the Ninth Circuit has "reiterated many times that an alien cannot appear *pro se* without a

19  knowing and voluntary waiver of the right to counsel." *Id.* at 1242.  This means that IJ's, "at a minimum...,

20  must [ (1) ] inquire whether the petitioner wishes counsel, [ (2) ] determine a reasonable period for

21  obtaining counsel, and [ (3) ] assess whether any waiver of counsel is knowing and voluntary." *Id.* at

22  1241; *accord Biwot v. Gonzales*, 403 F.3d 1094 (9th Cir. 2005).  To meet the third element, a valid

23  waiver, "an IJ must generally: (1) inquire specifically as to whether petitioner wishes to continue without a

24  lawyer; and (2) receive a knowing and voluntary affirmative response." *Ram*, 529 F.3d at 1242 (citing

25  *Tawadrus*, 364 F.3d at 1103).  Moreover, at the time of Garcia's deportation proceeding, this obligation to

26

27

28

1  discuss the right to counsel with each respondent individually was codified at 8 C.F.R. § 242.16(a) (1991)

2  (*removed and reserved* 62 Fed.Reg. 10312, 10382 (Mar. 7, 1997)).[4]

3        Notably, and as the Ninth Circuit has repeatedly held, an alien's purported waiver of his right to

4  counsel is not valid unless the IJ specifically asks questions to determine whether the alien understands his

5  right to counsel and the implications of proceeding without counsel.  In *Castro-O'Ryan v. U.S. Dep't of*

6  *Immigration & Naturalization*, 847 F.2d 1307 (9th Cir. 1988), for example, an alien initially obtained

7  counsel for his deportation hearing, but that counsel subsequently withdrew.  As here, the IJ then

8  perfunctorily elicited a waiver from the alien:  When the deportation hearing resumed, the IJ elicited a

9  following colloquy ensued:

10      [IJ]:    You are here today by yourself, that is you don't have an attorney with you. Does that mean

11                that you intend to speak for yourself today?

12      [A]:    Yes, I do.

13      [IJ]:    All right.

14  *Id*. at 1311.  As the Ninth Circuit found in that case, and recently reiterated in *Tawadrus*, 364 F.3d at 1104

15  n.4, "[the alien's] laconic answer to [the IJ] was not an intelligent, voluntary waiver of counsel ... [The

16  alien] did not competently and understandingly waive his statutory right." *Id*. at 1313.

17        Likewise, in *Ram*, the Ninth Circuit found that an alien had not validly waived his right to counsel

18  where "at no time did [the IJ] direct any questions to [the alien] concerning the implications of"

19  proceeding without an attorney." *Id.* at 1242 (internal citations omitted).  As the court stated, "[m]aking

20  these inquiries is not a Herculean effort, and by not doing so, the IJ failed adequately to assess whether the

21  waiver by [the alien] was knowing and voluntary." *Id.* (citations omitted).

22        In Mr. Garcia's case, the IJ employed exactly the perfunctory and inadequate solicitation of waiver

23  that the Ninth Circuit deemed invalid in *Castro-O'Ryan*, *Tawadrus*, and *Ram*.  Although the IJ

24  perfunctorily solicited a verbal waiver of the right to counsel, he never directed any questions to Mr.

25

26  _____

27      [4] "The Immigration Judge shall advise the respondent of his right to representation, at no
expense to the Government, by counsel of his own choice authorized to practice in the proceedings

28  and require him to state then and there whether he desires representation; [and] advise the respondent
of the availability of free legal services programs ... in the district where the deportation hearing is
being held[.]" 8 C.F.R. § 242.16(a)

1  Garcia concerning the implications of proceeding without counsel.  In particular, he never attempted to

2  assess whether Mr. Garcia understood his right to counsel or how counsel could assist him in applying for

3  relief, or whether Mr. Garcia's waiver was knowing and voluntary.  This procedure deprived Mr. Garcia of

4  his statutory and due process rights to counsel.

5                    **b.**   <u>Mr. Garcia Was Inadequately Advised Regarding the Appellate Waiver</u>

6         A waiver of the right to appeal a removal order does not comport with due process when it is not

7  "considered and intelligent."  *See United States v. Pallares-Galan*, 359 F.3d 1088, 1096 (9th Cir. 2004);

8  *United States v. Leon-Paz*, 340 F.3d 1003, 1005 (9th Cir. 2003).  As the Ninth Circuit held in *Pallares-*

9  *Galan*:

10              For a waiver to be valid, *the government* must establish by "clear and
            convincing evidence," *Gete v. INS*, 121 F.3d 1285, 1293 (9th Cir. 1997),

11              *that the waiver is "considered and intelligent." United States v. Lopez-*
            *Vasquez*, 1 F.3d 751, 753-754 (9th Cir. 1993)(en banc); *see also United*

12              *States v. Gonzalez-Mendoza*, 985 F.2d 1014, 1017 (9th Cir. 1993) (finding a
            due process violation where immigration judge failed to inquire whether

13              right to appeal was knowingly and voluntarily waived).

14  359 F.3d at 1097 (emphasis added.).  In this case, the government cannot establish by clear and

15  convincing evidence that any appellate waiver by Mr. Garcia was "considered and intelligent," because

16  any such waiver followed an invalid waiver of his right to counsel and was based on inadequate advisals

17  regarding his rights.

18         The short colloquy between the IJ and the group further demonstrates that any purported waiver

19  was not considered and intelligent. *See, e.g., Pallares-Galan*, 359 F.3d. at 1093, 1098 (no express or

20  implied waiver where IJ asked alien if he wished to appeal and alien stated that "[i]t would be better if I

21  leave my children, that's fine" (emphasis removed)); *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th

22  Cir. 2000) (finding due process violation in a section 1326 collateral appeal because IJ failed to tell the

23  defendant about his eligibility for waiver of deportation); *United States v. Arce-Lua*, 163 F.3d 559, 563

24  (9th Cir. 1998) (same); *Zarate-Martinez*, 133 F.3d at 1198 (holding that IJ's conversation with petitioner

25  where IJ asked, "do you understand your rights?" and petitioner responded "yes," did not "qualify as an

26  express or implied 'voluntary or intelligent' waiver of the right to appeal, even though IJ had previously

27  informed the group that they would have the right to appeal); *United States v. Lopez-Vasquez*, 1 F.3d 751,

28  753 (9th Cir. 1993) (en banc) (alien's waiver was not "considered and intelligent" even though the IJ

1  thoroughly explained the right to appeal at a group hearing because the IJ failed to solicit separate

2  responses from each individual; fact that the petitioner knew what an appeal was "was insufficient"; the

3  IJ's actions may have conveyed the message that the petitioners would not benefit from an appeal).

4      Just as in *Lopez-Vasquez*, the IJ here explained the right to appeal to the group without obtaining

5  separate confirmation that each individual understood the nature and purpose of the right.  Indeed, unless

6  Mr. Garcia affirmatively indicated he did not understand the right, he would be presumed to have

7  understood it.  This process "impermissibly presumes acquiescence in the loss of the right to appeal and

8  fails to overcome the presumption against waiver."  *Lopez-Vasquez*, 1 F.3d at 755 (*citing Barker v. Wingo*,

9  407 U.S. 514, 525 (1972)).

10     Moreover, at the close of Mr. Garcia's hearing, the IJ failed to determine whether Mr. Garcia

11 knowingly and intelligently waived his right to appeal.  Indeed, although he asked the *government* whether

12 it wished to appeal, the IJ never even asked Mr. Garcia whether he wished to exercise or waive his

13 appellate right.  Accordingly, the government cannot meet its burden of establishing that the waiver of the

14 right to appeal was "knowingly and intelligently made."

15             c.    <u>Mr. Garcia Was Not Adequately Advised of His Eligibility for Relief from</u>
                     <u>Deportation</u>

16

17     Mr. Garcia's due process rights were also violated in that the IJ failed adequately to inform him of

18 his eligibility for relief from deportation, despite the fact that Mr. Garcia was eligible for such relief.

19     An IJ's failure to advise the alien of his eligibility for relief from deportation makes a deportation

20 proceeding defective.  *Ubaldo-Figueroa*, 364 F.3d at 1048.  *See also Arce-Lua*, 163 F.3d at 563 ("[W]here

21 the record contains an inference that the petitioner is eligible for relief from deportation, the IJ must

22 advise the alien of this possibility and give him the opportunity to develop the issue"); *Lopez-Vasquez*, 1

23 F.3d at 754 (holding that IJ hearing deprived petitioner's right to due process even where the IJ explained

24 the right to appeal and provided petitioner with a form explaining his right to an appeal in Spanish

25 because the information was given to him in a group format); *Mendoza-Lopez*, 471 U.S. at 840 (failure of

26 IJ to advise alien of his right to appeal and his eligibility for a waiver of deportation violated his due

27 process rights and "amounted to a complete deprivation of judicial review of the determination); *Arrieta*,

28 224 F.3d at 1079 (finding due process violation because IJ failed to tell defendant about his eligibility for

1   a waiver of deportation); *Moran-Enriquez v. INS*, 884 F.2d 420, 423 (9th Cir. 1989) (where record, fairly

2   reviewed by a person intimately familiar with the immigration laws (the IJ) raises a reasonable possibility

3   that the petitioner may be eligible for relief, the IJ must advise the alien of this possibility, if the petitioner

4   is not advised of this possibility, the appellate waiver is invalid) (citing 8 C.F.R. § 242.17(a)).

5        Here, the IJ did inform Mr. Garcia that he appeared "eligible to apply for a waiver of deportability"

6   under "Section 212(c)."  However, the IJ never once explained to Mr. Garcia what Section 212(c) relief

7   was or what the requirements for obtaining such relief were.  Neither did he ask any questions of Mr.

8   Garcia, or advise him, regarding his prospects for receiving Section 212(c) relief if he did choose to apply.

9   To the contrary, he misleadingly suggested that Mr. Garcia would never get such relief, by advising him

10  that there was no waiver for someone with a prior conviction for cocaine possession, no matter what

11  amount of drugs involved.  Finally, the IJ never explained to Mr. Garcia how it was that he might be able

12  to apply for Section 212(c) relief despite his prior execution, at the urging of the immigration authorities,

13  of multiple forms purporting to waive all rights to apply for any relief.  It is hardly surprising that Mr.

14  Garcia, an alien with no legal education and experience, appearing *pro se* and without the benefit of

15  counsel, not understanding his prospects for Section 212(c) relief or even what such relief was, did not

16  apply for a Section 212(c) waiver.  The IJ's failure to advise him adequately as to that relief violated his

17  due process rights.

18        2.    Mr. Garcia Is Excused From § 1326(d)'s Exhaustion Requirement

19        Had Mr. Garcia "validly waived the right to appeal [his removal order] during the deportation

20  proceedings," he would be barred under § 1326(d) from collaterally attacking his underlying removal

21  order as a defense to the Section 1326 charge.  *Ubaldo-Figueroa*, 364 F.3d at 1048 (quoting *United States*

22  *v. Muro-Inclan*, 249 F.3d 1180, 1182 (9th Cir. 2001)).  However, the exhaustion requirement cannot bar

23  collateral review when – as in this case – any waiver of the right to administrative appeal did not comport

24  with due process.  *Id.*  Here, because the IJ deprived Mr. Garcia of his right to counsel and his appellate

25  rights, Mr. Garcia is excused from exhausting remedies.  Having failed to elicit a knowing and intelligent

26  waiver of the right to counsel, the IJ could not then – and did not – elicit a knowing and intelligent waiver

27  of the right to appeal.  Any waiver of the right to appeal was made without the contributions of counsel –

28  who certainly would have urged Mr. Garcia to press an appeal – and without an affirmative decision by

1   Mr. Garcia to accept the risk of proceeding without counsel or indeed to waive his appellate rights at all.

2   Likewise, the IJ's failure adequately to advise Mr. Garcia of his eligibility for relief served to persuade Mr.

3   Garcia that any appeal would be futile.

4           3.      Mr. Garcia Was Deprived of Judicial Review

5           To sustain a collateral attack on his removal order, Mr. Garcia must also demonstrate that the

6   deportation proceedings improperly deprived him of judicial review.  8 U.S.C. § 1326(d)(2).  As

7   explained above, Mr. Garcia was deprived of the opportunity for judicial review, because he did not make

8   a considered and intelligent waiver of his rights to counsel or appeal and because he was not adequately

9   advised as to his eligibility for relief..

10          4.      Mr. Garcia Satisfies the Prejudice Prong

11                  a.      Mr. Garcia Need Not Show Prejudice

12          Because the Ninth Circuit has **_never_** failed to find prejudice in a case where the respondent was

13  denied the right to counsel, the Ninth Circuit has not yet decided "whether the violation of the statutory or

14  regulatory right to counsel requires a showing of prejudice." *Ram*, 529 F.3d at n1.  Mr. Garcia submits it

15  does not.

16          It is well established that an immigration respondent is entitled to a presumption of prejudice

17  when his retained counsel is so ineffective as to deprive him of due process, such as by failing to file a

18  timely appeal.  *See Dearinger v. Reno*, 232 F.3d 1042, 1045 (9th Cir. 2000).  The Ninth Circuit has

19  concluded this presumption is justified because "the adversarial process itself has been rendered

20  presumptively unreliable" by the retained attorney's error. *Id.* (citing *Roe v. Flores-Ortega*, 528 U.S. 470,

21  483 (2000)).

22          Because the adversarial process is rendered just as unreliable when an IJ holds a removal hearing

23  without first obtaining a knowing and intelligent waiver of the right to counsel, the presumption of

24  prejudice should also apply here.  It would be illogical to presume prejudice from errors of counsel but not

25  from the deprivation of counsel.  *See Ram*, 529 F.3d at 1243 (describing the failure of the IJ to obtain a

26  knowing and intelligent waiver as a denial of the right to counsel.).  The government, therefore, bears the

27  burden of proving that the presence of counsel could not have made any difference in the proceedings.

28

1                 b.     <u>Even if Mr. Garcia need show some prejudice, he need only</u>
                            <u>show "potential" grounds for relief.</u>

2

3          The Ninth Circuit has never failed to find prejudice when an immigration respondent has been

4    denied the right to counsel.  This is because the Ninth Circuit has applied an uniquely low threshold for a

5    showing of prejudice in this context.  Specifically, while a respondent alleging a due process violation

6    usually must show "plausible" grounds for relief, the Ninth Circuit looks only for "potential" relief when a

7    respondent has been denied counsel.  *Compare Arrieta* (respondent not informed about 212(h) relief "does

8    not have to show that he actually would have been granted relief. Instead, he must only show that he had a

9    'plausible' ground for relief from deportation") *with Ram*, 529 F. 3d 1243 (prejudice established if "the

10   denial of right to counsel *potentially* affected the outcome of the proceedings."); *Biwot v. Gonzalez*, 403

11   F.3d 1094, 1100 (9th Cir. 2005) (finding respondent "easily clears this [prejudice] hurdle" simply because

12   "with an attorney, he would not have been forced to proceed pro se, to present a case with no evidence, to

13   answer the IJ's inquiries without any idea of their legal significance, or to purport unwittingly to waive his

14   appeal."); *Ahumada-Aguilar*, 295 F.3d at 950-951 (holding prejudice is established if a "competent

15   attorney" could have made any difference and finding prejudice because attorney would have (1) pursued

16   now foreclosed constitutional challenges; (2) "urged [respondent] to press an appeal in order to accrue the

17   final ten months necessary for him to qualify for a discretionary waiver of deportation;" (3) "advised

18   respondent of the significance of a deportation order;" and (4) "prevented [respondent] from making an

19   unknowing and involuntary waiver of his right to appeal based on misinformation.").

20         Here, there can be no question that the presence of counsel could have affected the outcome of

21   Mr. Garcia.  A "competent attorney" would have pursued relief under INA § 212(c), allowing Mr. Garcia

22   to avoid deportation and remain in the United States.

23                c.     <u>Mr. Garcia was potentially or plausibly eligible for relief</u>

24         Prior to 1996, a legal permanent resident like Mr. Garcia could apply for a discretionary waiver

25   of deportation under former Immigration and Nationality Act § 212(c).  8 U.S.C. § 1182(c) (1995 ed.).  To

26   qualify for such a discretionary waiver, Section 212(c) required the alien to have legal permanent resident

27   status and seven years of unrelinquished domicile.  *See id.*  When considering an alien's eligibility for

28   relief under INA § 212(c), an IJ must balance the defendant's equities against the adverse factors presented

1  by the defendant's conviction.  *See Ubaldo-Figueroa*, 364 F.3d 1042 (9th Cir. 2004).  The statute permits

2  the IJ to consider the hardship deportation will cause the respondent himself.  *See* 8 U.S.C. § 1182(c).

3          Here, there is no question that Mr. Garcia was eligible for § 212(c) relief.  Mr. Garcia gained his

4  legal permanent residence in 1990.  Moreover, because he acquired legal permanent residency through

5  amnesty, his period of lawful domicile began accruing upon the application for amnesty, as opposed to

6  when it was granted.  *See De Robles v. I.N.S.*, 58 F.3d 11355, 1360-61 (9th Cir. 1995).  Legal domicile for

7  the purposes of Section 212(c) continued to accrue until the order of deportation was final.  *See United*

8  *States v. Jimenez-Marmolejo*, 104 F.3d 1083, 1085 (9th Cir. 1996).  Mr. Garcia thus acquired domicile in

9  1987, when he petitioned for amnesty.  Accordingly, at the time of his deportation in October 1995, as a

10 legal permanent resident with more than seven years of domicile, Mr. Garcia qualified for Section 212(c)

11 relief.

12         Moreover, Mr. Garcia was prejudiced because he had plausible grounds for Section 212(c) relief.

13 The criteria for Section 212(c) relief includes the duration of an alien's residence, the impact of

14 deportation on the family, and other factors.  *See I.N.S. v. St. Cyr*, 533 U.S. 289, 296 n.5 (2001) (citing

15 *Matter of Marin*, 16 I&N Dec. 581 (1978).  In 1995, Mr. Garcia had lived in the United States for more

16 than 16 years, since he was a young child.  He was a legal permanent resident with more than seven years

17 of domicile.  He had a strong employment history and strong familial ties in the United States, with his

18 entire family either U.S. citizens or lawful permanent residents.  He spoke fluent English.  His only

19 alleged prior conviction was for simple possession of narcotics. His deportation would have had, and did

20 have, a devastating effect on him and his family.

21         Such factors are more than sufficient to establish plausible grounds for Section 212(c) relief.

22 Before 1996, Section 212(c) relief was often sought by those in deportation proceedings.  *See St. Cyr*, 533

23 U.S. at 296.  It was often granted.  Indeed, a majority of applications for Section 212(c) relief were

24 approved.  *Id.* at 296 n.5 (citing statistics regarding the frequency that Section 212(c) was granted).

25 Moreover, Mr. Garcia's personal circumstances established prima facie eligibility for relief.  *Cf., e.g.,*

26 *Nguyen v. I.N.S.*, 127 F.3d 1106 (9th Cir. 1997) (unpublished) (IJ granted § 212(c) relief to alien with

27 multiple convictions, including for voluntary manslaughter, because alien "had demonstrated outstanding

28 family ties, a long duration of residence, a favorable parole report, and remorseful behavior").  Mr. Garcia

1  was therefore prejudiced by the IJ's failure to advise him adequately regarding his eligibility for relief.

2  However, to the extent that this Court does not believe that Mr. Garcia has shown sufficient equities, he

3  asks this Court to set an evidentiary hearing, during which he can present evidence to show the plausibility

4  that he would have received relief from deportation.

5  **C.**    **The 1997 Deportation Was Invalid and Fundamentally Unfair**

6         1.    The Deportation Hearing Violated Due Process

7         Likewise, the 1997 deportation cannot support the indictment against Mr. Garcia, because it too

8  violated due process.  An IJ violates due process by erroneously characterizing an alien's prior conviction.

9  *Cf. United States v. Camacho-Lopez*, 450 F.3d 928, 930 (9th Cir. 2006) (due process violation where IJ

10 erroneously determined that alien's prior conviction was an aggravated felony).  Here, the IJ erroneously

11 found, contrary to the record, that Mr. Garcia was deportable due to his conviction for a firearms offense.

12        The 1997 OSC erroneously alleged that Mr. Garcia had been convicted of "the offense of

13 Manufacture, Importation of Firearms, in violation of Section 12020(a) of the California Penal Code."

14 Exh. I.  The OSC further alleged that Mr. Garcia was deportable under INA § 241(a)(2)(C) due to

15 conviction for an offense involving "any weapon, part or accessory which is a firearm or destructive

16 device (as defined in section 921(a) of Title 18, United States Code)."  Id.  In fact, however, Cal. Penal

17 Code § 12020(a) prohibits possession of a range of items, not just firearms and destructive devices.  In

18 Mr. Garcia's case, the conviction documents in the A-file clearly show that his alleged § 12020(a) offense

19 related to possession of a "billy," i.e., a nightstick, and not a firearm.  *See* Exh. J.  Moreover, a billy does

20 not fall within the definition of "destructive device" under 18 U.S.C. § 921(a)(4), which encompasses

21 explosives, bombs, grenades, and the like.

22        There was thus no basis for the IJ's conclusion that Mr. Garcia was deportable due to a firearms

23 offense.  He has never been convicted of, nor did the OSC allege, any other firearms offense.  Moreover,

24 to the extent that the IJ based his order on Mr. Garcia's alleged entry without inspection, that finding also

25 violated due process, in that Mr. Garcia's prior deportation and resulting loss of status was invalid, as

26 discussed above.

27

28

2.      Mr. Garcia Suffered Prejudice

Mr. Garcia was prejudiced by the IJ's errors because he had not committed a firearms offense, as alleged in the OSC against him, and because his prior deportation and resulting loss of status was invalid. As a result, there were no valid grounds of removability alleged against him. *See Camacho-Lopez*, 450 F.3d at 930 (alien's "Notice to Appear charged him as removable only for having committed an aggravated felony; as discussed above, [alien's] prior conviction did not fit that definition. Thus, [the alien] was removed when he should not have been and clearly suffered prejudice").

3.      Exhaustion and Deprivation of Judicial Review Need Not be Shown

Mr. Garcia is excused from the requirements of exhaustion of administrative remedies and denial of opportunity for judicial review. Because the IJ erroneously found Mr. Garcia removable, based in part on his purported conviction for a firearms offense, the IJ failed to inform Mr. Garcia of his eligibility for relief from removal. Specifically, the IJ failed to inform him that he was eligible for a number of forms of relief, such as cancellation of removal, adjustment of status, and voluntary departure. Such failure excuses a defendant from exhausting his administrative remedies and results in a denial of judicial review. *See Camacho-Lopez*, 450 F.3d at 930; *Ubaldo-Figueroa*, 364 F.3d at 1047; *United States v. Ortiz-Lopez*, 385 F.3d 1202, 1204 n.2 (2004).

**III.**

**ANY STATEMENTS BY MR. GARCIA SHOULD BE SUPPRESSED**

**A.      The Government Must Demonstrate Compliance with *Miranda*.**

Mr. Garcia moves to suppress any statements made in the field or at the border patrol station, due to violation of his *Miranda* rights.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Berkemer v. McCarty*, 468 U.S. 420, 428 (1984) (restating *Miranda* principles). "The ruling in *Miranda* prohibits 'custodial interrogation' unless the government first gives warnings to the [subject of the interrogation]." *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990). Once a person is in custody, *Miranda* warnings must be given prior to any interrogation. *See United States v. Estrada-*

1  *Lucas*, 651 F.2d 1261, 1265 (9th Cir. 1980).  Those warnings must advise the defendant of each of his

2  "critical" rights.  *United States v. Bland*, 908 F.2d 471, 474 (9th Cir. 1990).  If a defendant indicates that

3  he wishes to remain silent or requests counsel, the interrogation must cease.  *Miranda*, 384 U.S. at 474;

4  *see also Edwards v. Arizona*, 451 U.S. 477, 484 (1981).

5      To the extent that the government relies on a *Miranda* waiver, it must establish that Mr. Garcia's

6  waiver of his *Miranda* rights was voluntary, knowing, and intelligent.  *See Schneckloth v. Bustamonte*,

7  412 U.S. 218 (1973).  When interrogation continues without the presence of an attorney, and a statement

8  results, the government has a heavy burden to demonstrate that the defendant has intelligently and

9  voluntarily waived his privilege against self-incrimination.  *Miranda*, 384 U.S. at 475.  The court must

10  indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden

11  on the government is great.  *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984).

12      In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the

13  totality of the circumstances surrounding the case.  *Edwards v. Arizona*, 451 U.S. 477 (1981); *United*

14  *States v. Garibay*, 143 F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the

15  validity of a *Miranda* waiver requires a two prong analysis:  the waiver must be both (1) voluntary and

16  (2) knowing and intelligent.  *Derrick v. Peterson*, 924 F. 2d 813 (9th Cir. 1990).  The second prong

17  requires an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the

18  right being abandoned and the consequences of the decision to abandon it."  *Id.* at 820-821 (quoting

19  *Colorado v. Spring*, 479 U.S. 564, 573 (1987)).  Not only must the waiver be uncoerced, then, it must also

20  involve a "requisite level of comprehension" before a court may conclude that *Miranda* rights have been

21  legitimately waived.  *Id.* (quoting *Colorado v. Spring*, 479 U.S. at 573).  Unless and until *Miranda*

22  warnings and a knowing and intelligent waiver are demonstrated by the prosecution, no evidence obtained

23  as a result of the interrogation can be used against the defendant.  *Miranda*, 384 U.S. at 479.  The

24  government in this case must prove that Mr. Garcia waived his rights intelligently and voluntarily, an

25  allegation which he disputes.

26      1.    Pre-*Miranda* Statements

27      To the extent that Mr. Garcia made statements prior to any *Miranda* warning, in the field or

28  otherwise, those statements must be suppressed because he was in custody at the time.  A suspect is in

1  custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed,

2  would reasonably have led him to believe that he could not freely leave.  *See United States v. Lee*, 699

3  F.2d 466, 468 (9th Cir. 1982); *United States v. Bekowies*, 432 F.2d 8, 12 (9th Cir. 1970). Although

4  questions regarding routine biographical information usually do not trigger the safeguard of *Miranda*, the

5  exception does not apply "where the elicitation of information regarding immigration status is reasonably

6  likely to inculpate the [suspect]." *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046 (9th Cir.

7  1990). In fact, because of the close relationship between civil and criminal immigration investigations,

8  "[c]ivil as well as criminal interrogation of in-custody defendants by INS investigators should generally be

9  accompanied by the *Miranda* warnings." *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279 (9th Cir.

10  1983).

11       In determining whether an individual is in custody for purposes of *Miranda*, the Ninth Circuit

12  has instructed courts to consider "(1) the language used to summon the individual; (2) the extent to which

13  the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4)

14  the duration of the detention;  and (5) the degree of pressure applied to detain the individual." *United

15  States v. Kim*, 292 F.3d 971, 973 (9th Cir. 2002) (citations omitted). The same considerations apply in the

16  context of custody at the border. *See United States v. Estrada-Lucas,* 651 F.2d 1261, 1265 (9th Cir. 1980).

17  Furthermore, questions by agents implying a person is suspected of criminal activity can give rise to a

18  reasonable belief that one is not free to leave and thus turn an encounter with law enforcement into

19  custody for purposes of *Miranda. United States v. Chavez-Valenzuela,* 268 F.3d 719, 725 (9th Cir. 2001).

20       A person does not need to be physically restrained to be in "custody." The Ninth Circuit has

21  found that an individual questioned out in an open field, neither handcuffed or told he was under arrest, to

22  be in custody for purposes of *Miranda. United States v. Beraun-Panez*, 812 F.2d 578, 579 (1987). In that

23  case, the court held that "[a]lthough not physically bound, Beraun-Panez was subjected to psychological

24  restraints just as binding." *Id.* at 580.

25       Here, Mr. Garcia was clearly in custody at the time of his questioning in the field.  Agent Butler

26  was uniformed and driving a marked border patrol car.  He identified himself as a Border Patrol Agent

27  and immediately began interrogating Mr. Garcia and the other individuals in the group.  Mr. Garcia knew

28  that he was in the custody of law enforcement.  Moreover, the interrogation occurred at approximately

1  6:30 a.m. just off the highway, near the international border.  Reports do not indicate that any other

2  pedestrian or vehicle traffic was nearby.  Mr. Garcia was also immediately confronted with evidence of

3  guilt as Agent Butler began questioning him about his citizenship and nationality, the precise elements of

4  the § 1326 offense with which he is now charged.  The physical surrounding of the interrogation (an

5  isolated area off the highway near the international border, in the early morning hours) and Mr. Garcia's

6  physical and psychological condition (shivering cold, hungry, tired) only aggravated the coercive nature of

7  the interrogation.  This interrogation preceded any form of administration of Miranda rights by at least six

8  hours.  Because Mr. Garcia was in custody at the time of field questioning, any statements that he made

9  must be suppressed.

10        2.     Post-*Miranda* Statements

11       Any post-*Miranda* statements must also be suppressed because the government cannot

12  demonstrate that Mr. Garcia's waiver of his *Miranda* rights was knowing, voluntary, and intelligent.

13       In addition, such statements must be suppressed because any *Miranda* warnings were withheld

14  until after Mr. Garcia had already been questioned and made statements.  "The threshold issue when

15  interrogators question first and warn later is thus whether it would be reasonable to find that in these

16  circumstances the warnings could function 'effectively' as *Miranda* requires.  *Missouri v. Seibert*, 542 U.S.

17  600, 611-12 (2004) (plurality).  "By any objective measure," where interrogators withhold warnings until

18  after interrogation succeeds in eliciting a confession, "the warnings will be ineffective in preparing a

19  suspect for successive interrogation, close in time and similar in content."  *Id.* at 613.  Unless the warnings

20  could place a suspect who has just been interrogated in a position to make an informed choice to stop

21  talking even if he had talked earlier, "there is no practical justification for accepting the formal warnings

22  as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first..."

23  *Id.* at 612.  Thus, "it would ordinarily be unrealistic to treat two spates of integrated and proximately

24  conducted questioning as independent interrogations subject to independent evaluation simply because

25  *Miranda* warnings formally punctuate them in the middle."  *Id.* at 614.

26       Here, the agents intentionally questioned Mr. Garcia without the benefit of *Miranda* warnings,

27  and after eliciting statements, provided him with Miranda warnings and recorded his statement.  Because

28

1  the agents intentionally questioned Mr. Garcia without reading him his *Miranda* rights, under *Seibert*, his

2  subsequent, post-*Miranda* statements must be suppressed.

3  **B.      The Government Must Prove That Mr. Garcia's Statements Were Voluntary**

4          Even when the procedural safeguards of *Miranda* have been satisfied, a defendant in a criminal

5  case is deprived of due process of law if his conviction is founded upon an involuntary confession.

6  *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Jackson v. Denno*, 378 U.S. 368, 387 (1964).  The

7  government bears the burden of proving that a confession is voluntary by a preponderance of the evidence.

8  *Lego v. Twomey*, 404 U.S. 477, 483 (1972).

9          In order to be voluntary, a statement must be the product of a rational intellect and free will.

10  *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was

11  overborne in a particular case, the totality of the circumstances must be considered.  *Schneckloth v.*

12  *Bustamonte*, 412 U.S. 218, 226 (1973).  A confession is deemed involuntary if coerced by physical

13  intimidation or psychological pressure.  *Townsend v. Sain*, 372 U.S. 293, 307 (1963).  "The test is whether

14  the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied

15  promises, however slight, [or] by the exertion of any improper influence.'"  *Hutto v. Ross*, 429 U.S. 28, 30

16  (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).  *Accord United States v. Tingle*,

17  658 F.2d 1332, 1335 (9th Cir. 1981).  The government bears a heavy burden in demonstrating that a

18  confession is voluntary and the finding of voluntariness "'must appear from the record with unmistakable

19  clarity.'"  *United States v. Davison*, 768 F.2d 1266, 1270 (11th Cir. 1985).  Here, such a finding cannot be

20  made.

21          1.    This Court Must Hold A Hearing Under 18 U.S.C. § 3501 To Determine Whether Mr.
                Garcia's Statements Were Voluntary

22

23          Under 18 U.S.C. § 3501(a), "[b]efore [a] confession is received in evidence, the trial judge shall,

24  out of the presence of the jury, determine any issue as to voluntariness." This Court is thus required to

25  determine whether any statements made by Mr. Garcia were voluntary. Additionally, 18 U.S.C. § 3501(b)

26  requires this Court to consider numerous enumerated factors in determining whether Mr. Garcia

27  voluntarily made a statement. These factors include whether he understood the nature of the charges

28  against him and whether he understood his constitutional rights.

1      Section 3501(a) clearly requires this Court to make a factual determination. When a factual

2  determination is required, Federal Rule of Criminal Procedure 12 requires the court to make factual

3  findings. *See United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990). Since "'suppression

4  hearings are often as important as the trial itself,'" these findings should be supported by evidence, not

5  merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings. *Id.* at

6  610 (quoting *Waller v. Georgia,* 467 U.S. 39, 46 (1984)). Without the presentation of evidence, this Court

7  cannot adequately consider the 18 U.S.C. § 3501(b) factors.  Therefore, Mr. Garcia requests this Court

8  conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a) to determine, outside the presence of the

9  jury, whether the statements he made were voluntary.

10      2.   The Court Should Suppress Statements Due to Violation of the Safe Harbor Provision

11      When a statement is given by an accused within six hours of arrest, 18 U.S.C. § 3501(c) states

12  that the statement "shall not be inadmissible solely because of delay." *United States v. Mendoza*, 157 F.3d

13  730, 731 (9th Cir. 1998) ("18 U.S.C. § 3501(c) provides a six-hour 'safe harbor' after an arrest and before

14  the arraignment during which a confession will not be excludable solely because of delay"); *United States*

15  *v. Van Poyck*, 77 F.3d 285, 288 (9th Cir. 1996).  "A confession made after the safe harbor period may be

16  excluded solely because of the delay." *Mendoza*, 157 F.3d at 731.  This six-hour period may be extended

17  only if the delay is "reasonable" or public policy concerns weigh in favor admission.  *Id*. (citing *Van*

18  *Poyck*, 77 F.3d at 288; *United States v. Wilson*, 838 F.2d 1081, 1084 (9th Cir. 1988)).  The public policy

19  concerns to be considered include "discouraging officers from unnecessarily delaying arraignments,

20  preventing the admission of involuntary confessions, and encouraging early processing of defendants."

21  *Mendoza*, 157 F.3d at 731-31.

22      Here, there was more than a six-hour delay between Mr. Garcia's arrest and his subsequent

23  interrogation.  Mr. Garcia was arrested at approximately 6:30 a.m.  According to the government's

24  discovery, his videotaped interrogation did not begin until approximately 12:45 p.m.  Because the

25  interrogation occurred beyond the six-hour "safe harbor" permitted under 18 U.S.C. § 3501(c), an

26  evidentiary hearing is necessary to determine whether the delay was reasonable.

27

28

## IV.

## **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

As more information comes to light, due to the government providing discovery in response to these motions, or an order of this Court, the defense may find it necessary to file further motions, or to supplement existing motions with additional facts.  The denial of this request will result in a violation, at a minimum, of Mr. Garcia's Fifth and Sixth Amendment rights.  Therefore, defense counsel requests the opportunity to file further motions and supplementary briefing based upon information gained from discovery.

## V.

## **CONCLUSION**

For the foregoing reasons, Mr. Garcia respectfully requests that the Court grant the above motions.

Respectfully submitted,


DATED:        September 8, 2008                    /s/ *Jennifer L. Coon*
                                                 **JENNIFER L. COON**
                                                 Federal Defenders of San Diego, Inc.
                                                 Attorneys for Mr. Garcia

## CERTIFICATE OF SERVICE

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of information and belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

Courtesy Copy Court

Assistant United States Attorney via ECF

Dated: September 8, 2008

           ___/s/ Jennifer L. Coon_____
           JENNIFER L. COON
           Federal Defenders of San Diego, Inc.
           225 Broadway, Suite 900
           San Diego, CA 92101-5030
           (619) 234-8467  (tel)
           (619) 687-2666  (fax)
           e-mail: Jennifer_Coon@fd.org